**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 06-CR-35-LRR |
| vs. | | **SENTENCING** |
| | | **MEMORANDUM** |
| HARRIETTE COOPER, | | |
| Defendant. | | |

*TABLE OF CONTENTS*

*I.*   *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*   *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*   *THREE-STEP PROCESS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

*IV.*   *SENTENCING CALCULATIONS* . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*

   *A.*   *The USPO Properly Scored Defendant with a Base Offense Level of 12,*
   *Reflecting the Amount of Funds Involved in the Structuring.* . . . . . . *6*

   *B.*   *The USPO Properly Scored Defendant with Two-Level Increase for Having*
   *Knowledge that the Structured Funds Were Proceeds of Unlawful Activity,*
   *Pursuant to USSG §2S1.3(b)(1)* . . . . . . . . . . . . . . . . . . . . . . . . *9*

   *C.*   *The USPO Properly Scored Defendant with a Two-Level Increase for Use*
   *of a Special Skill or an Abuse of Trust Pursuant to USSG §3B1.3* . . *11*

      *1.*   *Abuse of Public or Private Trust* . . . . . . . . . . . . . . . . . . . *11*

      *2.*   *Use of a Special Skill* . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

   *D.*   *Defendant Committed Perjury in Her Testimony Before the Court at Her*
   *Sentencing Hearing on May 11, 2007* . . . . . . . . . . . . . . . . . . . . *16*

   *E.*   *Defendant Is Not Entitled to a Reduction of Her Sentence for Acceptance*
   *of Responsibility* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*

   *F.*   *Defendant Should Pay a Fine* . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

   *G.*   *A Downward Departure of Defendant's Sentence Is Not Warranted Based*
   *on Her Past Employment Record, Civic Contributions or Charitable*
   *Activities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *24*

*V.*   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *25*

# I.  INTRODUCTION

The matter before the court is the sentencing of Defendant Harriette Cooper on her plea of guilty to one count of structuring a financial transaction, in violation of 31 U.S.C. § 5324(a)(3) and (c).

# II.  PROCEDURAL BACKGROUND

On March 23, 2006, a grand jury charged Defendant in a seven-count Indictment. (docket no. 2).  On May 10, 2006, a grand jury charged Defendant, and her codefendant, Charles Hodges, Jr., in a twenty-four-count Superseding Indictment (docket no. 15). Defendant was named in Counts 3-10.

Counts 3-8 charge that, on six occasions between April 8, 2003 and April 29, 2003, Defendant knowingly transacted, or aided and abetted the transaction of, amounts totaling $40,354.76 in proceeds of a distribution of controlled substances for the purpose of evading the reporting requirements under section 5313(a) of Title 31 of the United States Code, in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(B)(ii).

Count 9 charges that, between April 8, 2003 and April 29, 2003, Defendant knowingly and for the purpose of evading the reporting requirements of section 5313(a) of Title 31 of the United States Code, and the regulations promulgated thereunder, structured and caused to be structured a financial transaction of $40,354.76, in violation of 31 U.S.C. § 5324(a)(3) and (c).

Count 10 charges that, on or about April 8, 2003 through and including April 29, 2003, Defendant willfully failed to file form 8300 with the Internal Revenue Service for the receipt of cash in the amount of $40,354.76 for the purchase of a home, in violation of 26 U.S.C. § 7203.

On August 8, 2006, the parties entered into a plea agreement ("Plea Agreement"). (docket no. 78-2).  On August 9, 2006, Defendant appeared before a United States Magistrate Judge and pled guilty to Count 9 of the Superceding Indictment.   On the same

Case 1:06-cr-00035-LRR   Document 130   Filed 07/18/07   Page 2 of 25

date, the undersigned accepted Defendant's guilty plea.

On January 30, 2007, the United States Probation Office ("USPO") filed a presentence investigation report ("PSIR") and also prepared a sentencing recommendation. On March 6, 2007, the government filed a Sentencing Memorandum ("Memorandum") (docket no. 103), and Defendant filed a Motion for Downward Departure or Variance ("Motion") (docket no. 104). On March 12, 2007, the USPO then prepared an Addendum to the PSIR. On May 2, 2007 the government filed an addendum to its Memorandum, and on May 9, 2007, Defendant filed an addendum to her Motion.

On May 10 and May 11, 2007 Defendant appeared at a sentencing hearing ("Hearing") before the undersigned. Assistant United States Attorney C.J. Williams represented the government. Defendant was personally present and represented by Attorney Leon Spies. At the conclusion of the Hearing, the court took under advisement the issues presented and reserved ruling until the entry of this Sentencing Memorandum.[1]

---

[1] At the Hearing, the court informed the parties that it would file a written sentencing memorandum thereafter.

The instant Sentencing Memorandum is primarily designed to provide a more detailed understanding of the court's reasoning on the contested advisory Sentencing Guidelines issues; it is not comprehensive. For example, the court's analysis of the factors at 18 U.S.C. § 3553(a) is outside the scope of this document. The Supreme Court recently stated:

> The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon the circumstances. Sometimes a judicial opinion responds to every argument; sometimes it does not; sometimes a judge simply writes the word "granted" or "denied" on the face of a motion while relying upon context and the parties' prior arguments to make the reasons clear. The law leaves much, in this respect, to the judge's own professional judgment.

*Rita v. United States*, No. 06-5754, 2007 WL 1772146, *12 (U.S. June 21, 2007). What is important is that "[t]he sentencing judge . . . set forth enough to satisfy the appellate

(continued...)

3

When sentencing resumes on July 19, 2007, the court shall pronounce a sentence consistent with the instant sentencing memorandum.

## III.  THREE—STEP PROCESS

The Eighth Circuit Court of Appeals has explained that, in the post-*Booker* world, "there are essentially three steps to determining an appropriate sentence." *United States v. Sitting Bear*, 436 F.3d 929, 934 (8th Cir. 2006).

> First, the district court should determine the applicable Sentencing Guidelines range without consideration of any Guidelines departure factors, because the Guidelines remain an important sentencing factor. *See* § 3553(a)(4). Second, the district court, where appropriate, should consider the departure provisions contained in Chapter 5, Part K and/or §4A1.3 of the Guidelines, as those sentencing provisions have not been excised by *Booker*. The resulting range is the post-*Booker* advisory Guidelines range. Third, the district court should consider the rest of the § 3553(a) factors in determining whether to impose the "Guidelines sentence" as determined in the prior steps or a "non-Guidelines sentence" driven by the other § 3553(a) considerations, and sentence the defendant accordingly. [*United States v.*] *Haack*, 403 F.3d [997,] 1003 [(8th Cir.), *cert denied*, 126 S. Ct. 276 (2005)]; *see also United States v. Denton*, 434 F.3d 1104, 1114 (8th Cir.2006) (reviewing the sentence imposed by the district court under the three-part *Haack* methodology).

*Id.* at 934-35. The court adheres to this three-step process. Furthermore, the "presumption of reasonableness" standard that is applied to a sentence calculated through such process is an appellate standard, and it is not employed here. *Rita v. United States*, No. 06-5754, 2007 WL 1772146, *9 (U.S. June 21, 2007) ("We repeat that the presumption before us

---

[1](…continued)

court that [she] has considered the parties' arguments and has a reasoned basis for exercising [her] own legal decisionmaking authority." *Id.* (citing *United States v. Taylor*, 487 U.S. 326, 336-37 (1988)).

4

is an *appellate* court presumption.")

## IV. SENTENCING CALCULATIONS

There are seven issues that bear on the sentencing calculation here: (A) whether the USPO properly scored Defendant with a base offense level of **12**, reflecting the amount of funds involved in the structuring; (B) whether the USPO properly scored Defendant with a two-level increase, pursuant to USSG §2S1.3(b)(1), for having knowledge that the structured funds were proceeds of unlawful activity; (C) whether the USPO properly scored Defendant with a two-level increase, pursuant to USSG §3B1.3, for use of a special skill or an abuse of trust; (D) whether Defendant is subject to a two-level increase, pursuant to USSG §3C1.1, for obstruction of justice because she committed perjury when testifying before the court at the Hearing; (E) whether Defendant is entitled to a two-level decrease, pursuant to USSG §3E1.1, for acceptance of responsibility; (F) whether Defendant should pay a fine; and (G) whether a downward departure is warranted based on her employment record, civic contributions and charitable activities. The court shall address each issue in turn.

To the extent necessary, the court makes factual findings under a preponderance of the evidence standard. *See United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [Sentencing Guidelines] are applied in an advisory manner."). The government bears the burden of proof on the instant advisory Sentencing Guidelines issues, except Defendant's request for a reduction, pursuant to USSG §3E1.1, for acceptance of responsibility and Defendant's request for a downward departure, pursuant to USSG §§5H1.5 and 5H1.11. *Compare United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2001) (stating that the government bears the burden to prove sentencing enhancements), *with Peters v. United States*, 464 F.3d 811, 812 (8th Cir. 2006) (stating that the defendant bears the burden to prove acceptance of responsibility) *and United States v. Lussier*, 423

5

F.3d 838, 843 (8th Cir. 2005) (holding that defendant "has the burden of proving that a reduction in the offense level should apply").

> ### A. The USPO Properly Scored Defendant with a Base Offense Level of 12, Reflecting the Amount of Funds Involved in the Structuring.

Appendix A to the Sentencing Guidelines states that the applicable guideline for a violation of 31 U.S.C. § 5324 is USSG §2S1.3. USSG Appx. A.

The Sentencing Guidelines base the offense level for the crime of structuring on the value of the funds in the offense of conviction. The base offense-level is "**six** plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the funds. . . ." USSG §2S1.3(a)(2). The table offered in Section 2B1.1 states, in part, as follows:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| $5,000 or less | no increase |
| More than $5,000 | add **2** |
| More than $10,000 | add **4** |
| More than $30,000 | add **6** |
| More than $70,000 | add **8** |

USSG §2B1.1

The relevant Application Note, note 1, for §2S1.3 reads, "[f]or purposes of this guideline, 'value of the funds' means the amount of the funds involved in the structuring or reporting conduct. The relevant statutes require monetary reporting without regard to whether the funds were lawfully or unlawfully obtained." USSG §2S1.3, cmt. (n.1).

Several courts have discussed the contours of the "value of funds" provision, though the Eighth Circuit Court of Appeals has not discussed it. In *United States v. Beras*, 183 F.3d 22, 24 (1st Cir. 1999), defendant A and defendant B arrived at an airport together in Puerto Rico carrying $75,000 and $63,794 respectively, which they did not report. *Id.*

6

at 24. Defendant A argued that, for purposes of §2S1.3(a)(2), the "value of funds" should be only $75,000, not $138,794. *Id*. at 27, fn.4. The First Circuit Court of Appeals found the argument "totally without merit" because defendant A and defendant B "together were transporting $138,794 . . . [and] the entire amount belonged to" defendant A. *Id*. The implications are useful for present purposes. First, a defendant is liable for all of the structured funds, not just amounts over the reporting threshold, namely, $10,000, and amounts handled exclusively by codefendants. Second, a defendant may not shield himself or herself from structuring liability by dividing cash among codefendants.

The Fourth Circuit Court of Appeals in *United States v. Abdi*, 342 F.3d 313 (4th Cir. 2003), rejected the argument that the "value of funds" for purposes of §2S1.1(a)(2) are only those amounts that subsequently fund "unlawful purposes," namely, terrorism. *Id*. at 318-319. It held instead that the value of funds "is the entire amount of the funds that the defendant structured because that is the amount 'involved in the structuring or reporting conduct.'" *Abdi*, 342 F.3d at 319 (quoting USSG §2S1.3(a)(2), cmt. (n.1)). It went on to explain that the "value is not limited to the portion of the funds above $10,000 on any given day, and the provision grants no discretion to the court to reduce the amount." *Id*. at 319. Further, the district court in *United States v. Bariek*, 2005 WL 2334682, No. 01:05CR150JCC (E.D.Va. 2005), recognized the *Abdi* holding and calculated the "value of funds" based on "'the entire amount of the funds'" transmitted. 2005 WL 2334682 at *2 (quoting *Abdi*, 342 F.3d at 319). The court in *United States v. Builes*, 837 F.Supp. 490, 492 (N.D.N.Y. 1993), also held that the entire amount of the transfer, not just the $10,000 trigger-amount, counted towards the calculation of the offense level.

Defendant helped Charles Hodges, Jr. ("Hodges") make a down payment on a house in the amount of $40,354.76. (Plea Agreement at 5). Defendant contends that the "value of funds" should be based only on $20,000 of the $40,354.76 down payment made

7

on the house by Hodges.  Defendant argues that because only $20,000 of the $40,354.76 given to her by Hodges was divided into smaller amounts in cashier's checks, the structuring crime only attaches to that smaller amount.  For sentencing purposes, Defendant urges the court to calculate the sentence based on the amounts that she "broke down" into smaller amounts.

The government responds that, even if there were multiple payments as Defendant alleges, the calculated amount for sentencing purposes should be the total, between Defendant and Hodges, transacted to avoid the reporting requirements, which is $40,354.76.

Application Note 1, coupled with the case law, makes plain that Defendant's base offense level should be based on the entire amount structured, $40,354.76.[2]  She obtained six cashier's checks from multiple banks.  (Plea Agreement at 6).  Indeed, Hodges testified at the Hearing that he discussed with Defendant the need to bring her amounts as near to $10,000 as possible in order to avoid triggering the reporting requirements.  He went on to note that Defendant told him that she could not receive all of his cash payments at once because she would have to get separate cashier's checks.  He testified that Defendant said she would arrange for the separate cashier's checks.  It is irrelevant if Defendant physically divided the cash into smaller amounts, if she instructed Hodges to deliver smaller increments of cash to her, collected his payments and transacted them for cashier's checks at multiple banks.

The absurdity of Defendant's interpretation adds further support to this result. Under Defendant's interpretation, if she had not divided any of the funds for Hodges, the calculation of funds structured by her would be $0.  Put differently, she would have the

---

[2]    The issue may be moot because after cross-examination Defendant finally admitted to breaking down an additional $10,300, which increases her total admitted amount to $30,300.  This amount exceeds the guideline threshold, and whether the amount structured is $30,300 or $40,354.76, the six-level increase applies.

8

court believe that she pled guilty to structuring but has not structured any funds.

Therefore, based on USSG §2S1.3(a)(2), Defendant's base offense-level is 12.

**B.** ***The USPO Properly Scored Defendant with Two-Level Increase for Having Knowledge that the Structured Funds Were Proceeds of Unlawful Activity, Pursuant to USSG §2S1.3(b)(1).***

Section 2S1.3(b)(1) of the Sentencing Guidelines states that, "[if] . . . (A) the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity . . . , increase by **2** levels." USSG §2S1.3(b)(1) (emphasis in original). The Sentencing Guidelines provide no Application Notes for this subsection.

The Eighth Circuit Court of Appeals has acknowledged that the illicit funds enhancement inquiry is a factual one. *United States v. Mitchell*, 31 F.3d 628, 633 (8th Cir. 1994) (upholding a district court's finding of defendant's knowledge based on his conduct). Specifically, the *Mitchell* court listed a variety of conduct that strongly suggested the defendant, a real estate broker, knew that the funds being structured were derived from unlawful activities. *Id*. at 633.

> We find abundant evidence in the record upon which the court properly could base its finding, including that Mitchell had enjoyed a long friendship with Dowdy; that Mitchell had visited the home of one of Dowdy's girlfriends, Vicky Nixon, on several occasions when significant amounts of cash and drugs were on hand; that Mitchell had been a fireman and therefore was familiar with Dowdy's earning capacity yet also was aware of Dowdy's extravagant lifestyle; that Mitchell paid the bulk of the Troost Property's purchase price in cash in small denominations delivered in paper or plastic bags; and that Dowdy was the true owner of the Troost Property.

*Id*.

The record shows by a preponderance of the evidence that Defendant knew that the funds were derived from unlawful activities. Defendant's statements at her initial

9

interview by law enforcement are especially illuminating. She told agents that Hodges told her that he did not want to convert his cash into cashier's checks. Agent Robinson testified at the Hearing that Defendant told agents at her initial interview that Hodges's lifestyle was probably not legitimate. For example, his expensive clothes and cars suggested as much to her. Agent Robinson further testified that Defendant said that she was suspicious of Hodges's lifestyle and that she had not been sleeping well since the house was sold to Hodges and expected someone to contact her about the sale. When asked by the agents if she knew Hodges was a drug dealer, she explained that she was from the south side of Chicago and "knew what was going on." She stated that she discussed the transaction with her husband but let the matter drop.[3] Moreover, she admitted to the agents that when she got the cashier's checks for Hodges she knew that she was doing something wrong. She stated that she still went through with the transaction because she had invested so much time into getting Hodges a home.

Defendant's own conduct also supports this conclusion. She testified that she took no steps to discover the source of the cash provided to her by Hodges. Hodges testified that Defendant told him that she did not want to know the source of the cash. Furthermore, testimony at the Hearing from Iowa Realty divisional president William Grabe made plain that she did not handle the cash according to the normal course of business at Iowa Realty; she did not document the receipt thereof; she did not produce a receipt for Hodges; she did not deposit Hodges's payments in Iowa Realty's trust account, or otherwise notify her colleagues of the transactions. Don Knapp, a realtor at Iowa Realty who assisted in securing the financing for the house, testified at the Hearing that Defendant told him that a woman from Chicago was purchasing the house, not a man from Cedar Rapids, Iowa. Perhaps most tellingly, Defendant obtained cashier's checks from

---

[3] At the time of this conversation Defendant's husband was a federally convicted drug (cocaine) dealer.

10

multiple banks and even different branches of the same bank. (Plea Agreement at 6).

Other indicia nearly foreclose the issue. Hodges testified at the Hearing that he delivered cash payments to Defendant in a brown-paper bag on several occasions. He testified that he told Defendant that he did not want to make a down payment greater than $10,000 because it might attract the attention of the IRS. He told Defendant that he did not want the house in his name because he was unemployed and his income in trading cars would not support the amount of the down payment. He further testified that he had smoked marijuana before meeting with Defendant on at least one occasion and was under the influence at such meeting. Defendant stated that Hodges's car often smelled like marijuana. Her husband has a federal criminal history that includes a conviction of possession of cocaine with the intent to distribute. Hodges testified that he had smoked marijuana with family members of Defendant. On one occasion, bank tellers remarked that the cash provided by Defendant, from Hodges, powerfully smelled of marijuana.

Accordingly, the court finds that a two-level increase pursuant to USSG §2S1.3(b)(1) is appropriate.

### C. The USPO Properly Scored Defendant with a Two-Level Increase for Use of a Special Skill or an Abuse of Trust Pursuant to USSG §3B1.3.

#### 1. Abuse of Public or Private Trust

Section 3B1.3 reads in pertinent part, "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels." USSG §3B1.3 (emphasis added).

The Application Notes define "public or private trust" as:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less

11

> supervision than employees whose responsibilities are
> primarily non-discretionary in nature. For this enhancement
> to apply, the position of public or private trust must have
> contributed in some significant way to facilitating the
> commission or concealment of the offense (e.g., by making the
> detection of the offense or the defendant's responsibility for
> the offense more difficult). This adjustment, for example,
> applies in the case of an embezzlement of a client's funds by
> an attorney serving as a guardian, a bank executive's
> fraudulent loan scheme, or the criminal sexual abuse of a
> patient by a physician under the guise of an examination. This
> adjustment does not apply in the case of an embezzlement or
> theft by an ordinary bank teller or hotel clerk because such
> positions are not characterized by the above-described factors.

USSG §3B1.3, cmt. (n.1).

The Eighth Circuit Court of Appeals has never ruled that a real estate broker held a position of trust, public or private, and abused that trust for purposes of §3B1.3. However, it is clear that the "abuse of trust" analysis has both a legal and factual component. "'[O]rdinary commercial relationships do not constitute a trust relationship sufficient to invoke §3B1.3 enhancement,'" but the analysis must also be "fact intensive because it turns on the precise relationship between defendant and her victims . . . ." *United States v. Baker*, 200 F.3d 558, 564 (8th Cir. 2000) (citing, in part, *United States v. Moor*, 29 F.3d 175, 180 (4th Cir. 1994)); *see also United States v. Trice*, 245 F.3d 1041, 1042 (8th Cir. 2001) (holding that "arm's length business relationships" do not provide a basis for a position of trust).

Further complicating the analysis is the crucial distinction between "public" and "private" trusts. Research has revealed no case where a court has found that a real estate broker holds a public trust for purposes of §3B1.1. Nonetheless, the Eighth Circuit Court of Appeals has ruled that a defendant abused a public trust even where no private or fiduciary relationship existed between the defendant and victim. *See*, *e.g.*, *United States v. Goldman*, 447 F.3d 1094, 1096 (8th Cir. 2006) (holding that defendant-attorney's false

12

and misleading testimony on behalf of client in bankruptcy proceeding abused public trust); *United States v. Fitzhugh*, 78 F.3d 1326, 1331-2 (8th Cir. 1996) (holding that defendant-attorney held position of public trust in defrauding Small Business Administration); *United States v. Armstrong*, 992 F.2d 171, 173 (8th Cir. 1993) (holding that correctional officer convicted of counterfeiting abused public trust by enlisting inmates to develop his scheme). In each of these cases, there was an explicit finding of an abuse of public trust.

Only the Fourth Circuit Court of Appeals has approved of a finding that a real estate broker held a position of private trust and abused that trust, warranting an upward enhancement. *United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999) (finding no clear error in district court's holding that real estate brokers using client keys to homes to steal credit card information abused private trust). Conversely, the Seventh Circuit Court of Appeals expressly rejected a district court's finding that a real estate broker held a position of private trust for purposes of a sentencing enhancement. *United States v. Brown*, 47 F.3d 198, 205 (7th Cir. 1995) (holding that real estate brokers had a commercial relationship with victims of Ponzi scheme, not a fiduciary one).

Based on the case law above, in order for Defendant to qualify for the "abuse of trust" enhancement, the court must hold that Defendant, as a real estate broker, held a position of either private or public trust.

The court finds that Defendant held a position of public trust. Real estate brokers in Iowa are governed by the Code of Iowa, Iowa Code chapter 543B (2007), and the Iowa Administrative Code, Iowa Admin. Code r. 193 (2007). To qualify for a "broker license" an applicant must not have been convicted "of any crime involving moral turpitude," including, among other things, "conspiracy to defraud" and "obtaining money under false pretenses." Iowa Admin. Code r. 193-3.1(3). Applicants are "subject to a national criminal history check through the federal bureau of investigation" and must provide "fingerprints to the department of public safety for submission" to the bureau as well.

13

Iowa Code § 543B.15(10).

The holder of a broker license may have such license revoked for, among other things, "knowingly making misleading, deceptive, untrue or fraudulent representations in the practice of the profession or engaging in unethical conduct or practice harmful or detrimental to the public. Proof of actual injury need not be established." *Id.* at § 543B.15(29). A broker license therefore is reserved for those meeting legal and ethical standards not incumbent upon the average citizen. These more exacting standards are required, Application Note 1 explains, because "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." USSG §3B1.3, cmt. (n.1). Relatedly, "[f]or this enhancement to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id.*

Defendant's position as a licensed real estate broker undoubtedly allowed her to structure and launder the funds provided by Hodges in a manner unlikely to garner the attention of others, just as the attorneys in *Goldman* and *Fitzhugh* and the corrections officer in *Armstrong* were able to avoid detection. Defendant testified that it was not uncommon for her to handle large amounts of cash and that she was a frequent customer at several banks as part of her professional practice. Defendant testified that she arranged for the third-party financing of Hodges's home and that, while rare, such financing arrangements were also part of her professional practice. These tasks, if not performed by a licensed real estate broker, would certainly have aroused greater suspicion among the bank employees, the seller, the seller's attorney, the lender and the lender's attorneys, than if performed by Hodges. Bridget McWhorter, former teller at Commercial Federal Bank, testified that she did not question Defendant's possession of a large amount of cash because

14

she knew Defendant was a real estate broker and that the check was made out to an escrow company. Such an absence of suspicion goes to the very heart of a public trust.

Therefore, the court finds that Defendant has abused a public trust for purposes of USSG §3B1.3, and a two-level upward adjustment is warranted.

### 2. *Use of a Special Skill*

Even if Defendant had not abused a public trust, the court would find that there Defendant used a "special skill" in structuring the funds. The Eighth Circuit Court of Appeals frames the legal question as "not whether the task could be performed by a person without special skills, but whether the defendant's special skills aided [her] in performing the task." *United States v. Covey*, 232 F.3d 641, 647 (8th Cir. 2000); *see also United States v. Bush*, 252 F.3d 959, 962 (8th Cir. 2001) (quoting *Covey*).

Defendant argues that, as a real estate broker, she used no special skills peculiar to her profession to assist her in obtaining six cashier's checks each no greater than $10,000.

The Eighth Circuit Court of Appeals rejected a similar argument in *United States v. Culver*, 929 F.2d 389 (8th Cir. 1991), when it upheld a two-level enhancement for the defendant's skill as a pilot, even though he was arrested before he "had an opportunity to pilot the plane." *Id*. at 393. "Appellant's skill as a pilot extends to more than actually flying the aircraft. His skills were required to plan for fuel, devise flight paths, and to prepare the aircraft for flight after the undercover agent left." *Id*.

The *Culver* holding underscores how Defendant's response ignores the concept of relevant conduct. It provides that "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" shall form the basis for any determination under Chapter 3 (such as adjustments under §3B1.1), if such acts "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . ." USSG §1B1.3(a)(1)(A)-(B); *see also United States v. Andreano*, 417 F.3d

15

967, 970 (8th Cir. 2005) (holding that "conduct comprising a dismissed count may be used as relevant conduct for sentencing purposes"); *United States v. Ross*, 279 F.3d 600, 605 (8th Cir. 2002) (holding that all relevant conduct in a fraud and money laundering scheme bears on a defendant's offense level, not just the offense of conviction).

Here, Defendant's involvement did not end with the structuring transactions but continued with the purchase of, and closing on, the residence at 267 Tomahawk Trail SE. Hodges testified that she showed him as many as ten houses for sale. Defendant testified that she prepared and reviewed documentation; that she arranged for private third-party financing because of Hodges's poor credit; and that she assisted in titling the home in the name of Hodges's sister. Perhaps most importantly, she provided a veneer of legitimacy to a real estate purchase that Hodges could not have facilitated on his own. Indeed, Defendant's role in the scheme with Hodges was not merely to obtain cashier's checks on his behalf but to further convert such funds into real property.

Therefore, the court finds by a preponderance of the evidence that Defendant exercised the skills of a real estate broker to aid in Hodges' money laundering scheme. Therefore, Defendant merits two-level upward adjustment for employing her special skills as a real estate broker.

### D. Defendant Committed Perjury in Her Testimony Before the Court at Her Sentencing Hearing on May 11, 2007.

USSG §3C1.1 provides for a two-level increase in a defendant's offense level if

> the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . . .

USSG §3C1.1. The Application Notes explain that such obstructive conduct includes "committing, suborning, or attempting to suborn perjury, including during the course of

Case 1:06-cr-00035-LRR   Document 130   Filed 07/18/07   Page 16 of 25

a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction . . . ." *Id.*, cmt. (n.4(b)). The Eighth Circuit Court of Appeals specifies that, for a perjury enhancement, "the district court must find that the defendant gave 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Thundershield*, 474 F.3d 503, 507 (8th Cir. 2007) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

The court finds by a preponderance of the evidence that Defendant gave false testimony at the Hearing. First, she testified that she did not learn of the $10,000 transaction report threshold until she arrived at Collins Community Credit Union on April 10, 2003. On cross-examination, when asked if she was told by the bank teller that $10,000 was the reporting threshold, she respond that it was the first time she had ever heard or known about that threshold.

However, Hodges testified that he told Defendant some time in March of 2003 of the $10,000 threshold. Hodges explained that he and Defendant came to an agreement that the amount to be transacted would be as close to $10,000 as possible in order to avoid this very reporting requirement.

Moreover, it strains credulity for a real estate broker with nearly 20 years of financial experience to claim ignorance of the currency transaction reporting threshold. Defendant's own testimony underscores the extent to which real estate brokers become intimately familiar with the intricacies of home finance and commercial banking. It seems very unlikely that in all of Defendant's dealings with buyers and lenders that this legal requirement did not arise in her professional practice.

Second, Hodges testified that he only gave Defendant only even amounts in bills, yet one of the cashier's checks amounts to $5,354.76. Hodges testified that he never provided Defendant with this particular odd amount of cash, nor did he ever provide her

Case 1:06-cr-00035-LRR   Document 130   Filed 07/18/07   Page 17 of 25

with odd amounts of cash on other occasions.

However, Defendant testified that she did receive an odd amount from Hodges that she divided into cashier's checks for $5,000 and $5,354.76. She specifically testified that Hodges gave her $5,354.76. In other words, she would have the court believe that a drug dealer gave her a brown bag or envelope full of bills and coins and she accepted it.

The court finds that the false statements concerned material matters, specifically the elements of intent and value. Defendant's claim of not knowing the reporting threshold suggests that Defendant did not knowingly commit the crime to which she has pleaded. Defendant clearly made the claim during her testimony that she was surprised to learn from the bank teller of the reporting requirement. Her assertion that she received odd amounts from Hodges is a brazen attempt to shield herself from additional structuring liability. The only alternative explanation of the cashier's check in the odd-amount is further structuring by Defendant.

For these reasons, the court finds that Defendant has engaged in obstructive conduct meriting a two-level increase in her offense-level.

### E. Defendant Is Not Entitled to a Reduction of Her Sentence for Acceptance of Responsibility.

USSG §3E1.1(a) provides for two-level reduction in the event that a defendant "clearly demonstrates responsibility" for the offense. USSG §3E1.1(a). Further, the Commentary to §3E1.1 states:

> In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> (a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to

18

volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;

(b) voluntary termination or withdrawal from criminal conduct or associations;

(c) voluntary payment of restitution prior to adjudication of guilt;

(d) voluntary surrender to authorities promptly after commission of the offense;

(e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(f) voluntary resignation from the office or position held during the commission of the offense;

(g) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

(h) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

*Id.*, cmt. (n.1).

Here, the most relevant factor to consider is whether a defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed]

19

or not falsely den[ied] any additional relevant conduct for which the defendant is accountable . . . ." *Id.*, cmt. (n.1(a)). The corollary to this factor is whether defendant "frivolously contests" relevant conduct. *Id.*

The Application Notes further explain that

> Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 . . . will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

*Id.*, cmt. (n.4(a)). In other words, although a defendant's guilty plea and the admission of the conduct comprising the offense and relevant conduct are strong indicators of acceptance of responsibility, such a defendant is not necessarily entitled to a two-level reduction under §3E1.1. *United States v. Byrd*, 76 F.3d 194, 196 (8th Cir. 1996); *United States v. Thompson*, 60 F.3d 514, 517 (8th Cir. 1995); *United States v. McQuay*, 7 F.3d 800, 802 (8th Cir. 1993).

The Application Notes, however, maintain that

> [c]onduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for [her] criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply.

USSG §3E1.1, cmt. (n.4). Thus, Sentencing Guidelines recommend that a finding of perjury pursuant to §3C1.1 shall preclude a reduction for acceptance under §3E1.1(a), except in extraordinary circumstances.

20

The Eighth Circuit Court of Appeals has established a framework for determining if such a case is extraordinary. *United States v. Honken*, 184 F.3d 961, 968 (8th Cir. 1999). The court should take into account "the totality of the circumstances, including the nature of the appellee's obstructive conduct and the degree of appellee's acceptance of responsibility." *Id.*, 184 F.3d at 968. Specifically, the court ought to consider whether "the obstruction of justice was an isolated incident early in the investigation or an on-going effort to obstruct the prosecution . . . or whether appellee voluntarily terminated his obstructive conduct, or whether the conduct was stopped involuntarily by law enforcement." *Id*. The Eighth Circuit Court of Appeals has repeatedly declined to overrule a district court's finding that a defendant is not entitled to the reduction as an "extraordinary case" for purposes of USSG §3E1.1(a).[4]

Defendant's obstructive conduct, when viewed in light of the *Honken* test, precludes an acceptance reduction. First, Defendant's perjury was not an isolated incident early in the investigation but a concerted effort to deceive the court at the Hearing. She maintained

---

[4] *United States v. Guel-Contreras*, 468 F.3d 517, 523 (8th Cir. 2006) (holding that defendant who perjured himself at codefendant's trial was appropriately denied acceptance reduction); *United States v. Brandt*, 419 F.3d 810, 812 (8th Cir. 2005) (holding that perjured testimony offered by defendant at sentencing hearing was appropriately denied acceptance reduction); *United States v. Killingsworth*, 413 F.3d 760, 765 (8th Cir. 2005) (holding that defendant who perjured himself in presentencing evidentiary hearing of co-conspirator was appropriately denied acceptance reduction); *United States v. Campos*, 362 F.3d 1013, 1016 (8th Cir. 2004) (holding that perjured testimony offered by defendant at trial was not entitled to acceptance reduction); *United States v. Molina*, 172 F.3d 1048, 1059 (8th Cir. 1999) (holding that defendant's clear perjury at her trial provided "sufficient basis" for withholding acceptance reduction); *United States v. Jefferson*, 112 F.3d 514, 1997 WL 231220, *1 (8th Cir. 1997) (holding that defendant's perjury before a magistrate judge appropriately precluded acceptance reduction); *United States v. Jagim*, 978 F.2d 1032, 1038 (8th Cir. 1992) (holding that defendant who committed perjury before grand jury was not entitled to acceptance reduction); *United States v. Eberspacher*, 936 F.2d 387, 389 (8th Cir. 1991) (holding that defendant who merely "bordered of perjuring himself" was not entitled to acceptance reduction),

21

in the Motion and at the Hearing that she was not aware of the IRS reporting threshold until April 10, 2003, even though she had discussed that threshold with Hodges in March of 2003. She insisted in her testimony that Hodges gave her an odd amount of cash, but Hodges testified that he never provided Defendant with an odd amount.

She objected to the finding in the PSIR that she structured more than one transaction. She maintained that position in the Motion. At the Hearing, Defendant first testified that she structured only one of the payments from Hodges, then later testified, once it could not be denied, that she structured an additional payment from Hodges amounting to $10,354.76, an odd amount that Hodges testified that he never gave her.

These amount to ongoing misrepresentations to the court that do not at all evidence an acceptance of responsibility but rather Defendant's frivolously contesting relevant conduct. Defendant admits what she cannot deny and denies what she cannot admit.

Accordingly, the court finds Defendant has not carried her burden of proving that she is entitled to a two-level a reduction for acceptance of responsibility.

### F.      *Defendant Should Pay a Fine*

A person, like Defendant, who violates 18 U.S.C. § 1956(a)(1)(B)(ii) "shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater . . . ." 18 U.S.C. § 1956(a). Given that, at most, the value of the property involved is $40,354.76, the statutory maximum for Defendant's offense is a $500,000 fine.

The Sentencing Guidelines suggest that if a defendant has established that she is unable, or not likely to become able, to pay a fine, the court should not impose one; the provision offers a table for minimum and maximum fines for offense-level ranges. USSG §5E1.2(a)-(b). For the reasons set forth above, the court calculates Defendant's offense-level at 18; the range of fines for such level is $6,000 to $60,000. *Id*. However, the suggested range is tempered by subsection (c)(4), which states that the maximum range in

the table "does not apply if the defendant is convicted under a statute authorizing (A) a maximum fine greater than $250,000 . . . ." USSG §5E1.2(c)(4).

The Application Notes make plain that 18 U.S.C. § 1956(a) is such a statute. USSG §5E1.2, cmt. (n.5).

The Sentencing Guidelines state that the court ought to consider eight factors in determining the amount of the fine:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
> (4) any restitution or reparation that the defendant has made or is obligated to make;
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
> (6) whether the defendant previously has been fined for a similar offense;
> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and
> (8) any other pertinent equitable considerations.

USSG §5E1.2(d).

The Eighth Circuit Court of Appeals has made plain that "[t]he district court need not provide detailed findings under each of the factors . . . , but must provide enough information on the record to show that it considered the factors . . . so that the appellate court can engage in meaningful review." *United States v. Berndt*, 86 F.3d 803, 808 (8th Cir. 1996); *see also United States v. Houchin*, 413 F.3d 750, 752-53 (8th Cir. 2005) (quoting *Berndt*); *United States v. Hines*, 88 F.3d 661, 663 (8th Cir. 1996) ("[I]f the

23

sentencing court complies with [these factors], any constitutional ability-to-pay limitation will necessarily be met.")

Defendant knowingly assisted Hodges in financing and purchasing a residence in order to launder the illicit proceeds of his business. Such proceeds are nearly useless to criminals like Hodges unless can convert them into legitimate assets. Absent conduct like that of Defendant, the financial incentives in the narcotics trade would be greatly diminished.

Defendant profited from the sale through a commission. The imposition of a fine both deprives Defendant of her gain from the illicit transaction and deters other real estate professionals from facilitating similar sales.

The PSIR reveals that Defendant has a positive net worth of $75,762.58. She owns a home with a net value of $24,474.00 and two cars with a net value of $14,218.00, as well as nearly $10,000 in cash.

In light of these facts, the court determines that Defendant is able and should pay a fine within the range suggested by §5E1.2.

**G. A Downward Departure of Defendant's Sentence Is Not Warranted Based on Her Past Employment Record, Civic Contributions or Charitable Activities.**

Defendant seeks a downward departure based on her employment record, civic contributions and charitable activities. Section 5H1.11 of the Sentencing Guidelines reads, "Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." USSG §5H1.11. Furthermore, USSG §5H1.5 reads, "Employment record is not ordinarily relevant in determining whether a departure is warranted." USSG §5H1.5.

The Eighth Circuit Court of Appeals has read these guidelines as providing for a downward departure based on these elements in only extraordinary circumstances or when

24

the activities are exceptional in nature. *United States v. Huber*, 462 F.3d 945, 952 (8th Cir. 2006) (holding that departure for defendant's substantial charitable contributions and generosity over many years was not clearly erroneous); *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (departure based upon care of two high school drop-outs and elderly neighbor); *see also United States v. Haversat*, 22 F.3d 790, 798 (8th Cir. 1994) (stating extraordinary circumstances standard); *United States v. Simpson*, 7 F.3d 813, 819 (8th Cir. 1993) (same); *United States v. Big Crow*, 898 F.2d 1326, 1331 (8th Cir. 1990) (same).

Although Defendant is undoubtedly active in community organizations and her church, the court finds that these activities do not rise to the level of exceptional. Therefore, the request for a downward departure on this basis is denied.

## V. CONCLUSION

Consistent with the pronouncements made during sentencing, the court determines that Defendant's base offense-level under USSG §2S1.3(a)(2) is **12**. Additionally, the court found a **two**-level increase pursuant to USSG §2S1.3(b)(1), a **two**-level increase pursuant to USSG §3B1.3, and a **two**-level increase pursuant to USSG §3C1.1 to be merited. Therefore, the court found Defendant's total offense level to be **18**, and her Criminal History Category to be I. Finally, the court deemed it appropriate to **deny** Defendant's motion for downward departure pursuant to USSG §5H1.5 and USSG §5H1.11.

**IT IS SO ORDERED.**

**DATED** this 18th day of July, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA